UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

## CRIMINAL MINUTES - GENERAL

| Case No. | CR 12-1076-CAS | Date | September 20, 2013 |
|---|---|---|---|

| Present: The Honorable | CHRISTINA A. SNYDER |
|---|---|

| Interpreter | ELISA CABAL/MONICA DESIDERIO |
|---|---|

| MONICA SALCIDO | LAURA ELIAS | ROSALIND WANG |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendant: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| 4) ROSA MARIA MAYORQUIN | X | X | | GREGORY NICOLAYSEN | X | X | |

Proceedings:

**DEFENDANT'S MOTION TO SUPPRESS** (filed May 31, 2013) (EVIDENTIARY)

## I.    INTRODUCTION

Defendant Rosa Mayorquin is charged with (1) conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 846, and (2) possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii).  On May 31, 2013, defendant filed a motion to suppress narcotics seized during a search of defendant's vehicle that took place on May 8, 2011.  Dkt. No. 58.  The government filed an opposition on August 29, 2013.  On September 16, 2013 and September 20, 2013, the Court held a hearing.  After considering the parties' arguments, the Court finds and concludes as follow.

## II.    BACKGROUND

The stop and subsequent search at issue in this motion originated with a wiretap of a phone used by defendant's co-defendant Sergio Vargas.  On this wiretap, government agents recorded multiple conversations between Vargas and defendant's son, Victor Suarez.  On May 5, 2011, this wiretap recorded Vargas telling Suarez that he was "in need of an errand . . . from Los Angeles . . . to a place in San Jose."  Davila Decl. ¶ 4.  Vargas clarified that this errand involved "seven shirts" and that it would be "paid right away there."  Id.  The government contends that Vargas's use of the phrase "seven shirts" was in fact a coded reference to seven pounds of methamphetamine that Vargas wanted moved from Los Angeles to San Jose.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

The following day, on May 6, 2011, the wiretap recorded Suarez telling Vargas that he was "arriving to my mom's place and she is asking why we are doing all this under so much pressure. She's like, 'Tell him that if he wants, you and I leave tomorrow instead in my truck . . . .'" Id. ¶ 6. As noted above, defendant is Suarez's mother. Later the day of May 6, Suarez again spoke with Vargas, informing him that, "My mother told me she wanted to leave around noontime . . . ." Id. ¶ 8. Suarez further suggested that he could "call and see if my uncle can lend us the office so we can store them there and then as soon as I get there, I'll deliver them." Vargas responded by inquiring, "Your uncle is trustworthy, right?"; Suarez responded, "Yes." Id.

Based on these conversations, government agents subsequently began surveilling the residence of Suarez's uncle, Carlos Maldonado. On May 7, 2011, the wiretap recorded Suarez against calling Vargas: "I'm already on my way over there. . . . I'll call you once I get there." Vargas responded, "It's six, six little dolls, okay?" Id. ¶ 15. Again, the government interprets the phrase "six little dolls" as code for six packages of methamphetamine. On the night of May 7, LAPD Detective Stephen Winter observed Suarez and defendant arrive at Maldonado's house in a white Dodge Caravan. Suarez and defendant entered the house, and Suarez emerged carrying a weighted back bag, which he placed in the rear of defendant's vehicle. Winter Decl. ¶¶ 3–4. Defendant and Suarez then left Maldonado's residence and began driving north.

At that point, early in the morning of May 8, 2011, the federal drug enforcement agents who were conducting the investigation contacted California Highway Patrol Officer Randy Royal. They requested that he locate the white Dodge Caravan with a certain license plate number. Davila Decl. ¶ 19; Royal Decl. ¶¶ 2. At 1:10 AM on May 8, 2011, Royal then observed defendant's white 2003 Dodge Caravan driving northbound on I-5. Having located a vehicle matching the description, Royal determined that the driver of the vehicle was exceeding the speed limit, and pulled over the driver of the Caravan. Defendant was driving; defendant's son and co-defendant Victor Suarez was riding along as a passenger. Id. ¶¶ 2–4. Royal informed defendant that she was speeding, and wrote her a speeding ticket. Id. ¶ 6. Royal finished the citation, and told defendant to have a nice night.

As defendant was walking back to her car, Royal asked defendant if everything in the vehicle belong to her. Defendant replied affirmatively. Royal then asked defendant if there were any drugs in the vehicle. According to Royal's declaration, "Defendant looked like she was going to cry, and said quickly, 'no.'" Royal then asked if he could search defendant's vehicle. Id. Defendant replied, "Yes," and signed a Spanish-language form consenting to the search. Id. ¶¶ 6–7.

Royal then employed a narcotics dog to examine the vehicle. After circling the vehicle,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

the dog alerted under the right rear bumper of defendant's vehicle. Royal arrested defendant and Suarez, and then moved the vehicle to a nearby parking lot to conduct a more thorough search. While searching defendant's vehicle, Royal dismantled a plastic panel inside the right rear side of the Caravan. Behind the panel, Royal discovered six vacuum wrapped packages of methamphetamine. Id. ¶ 11-12.

## III. ANALYSIS

Defendant makes several arguments in support of her motion to suppress the methamphetamine discovered in her vehicle. First, she argues that Royal did not have probable cause to search her vehicle. Second, she argues that she did not give Royal valid consent to search her vehicle. Finally, she argues that even if she gave valid consent, the search exceeded the scope of that consent. The government contests all three of these arguments.

The Court finds, for the reasons discussed below, that Royal had probable cause to search defendant's vehicle for narcotics. In light of this conclusion, the Court declines to reach the question of whether defendant consented to the search. In particular, even if defendant did not give her consent, the Court finds that (1) Royal was justified in making the initial stop of defendant's vehicle, (2) Royal was entitled to detain defendant and her vehicle while conducting the dog sniff, and (3) subsequent to the dog sniff, Royal had probable cause to search defendant's vehicle for narcotics. Each of these phases requires independent analysis under the Fourth Amendment, and as such, the Court will consider each in turn.

### A. Initial Stop of Defendant's Vehicle

The government offers two justifications for Royal's initial stop of defendant's vehicle. First, the government argues that Royal could stop defendant's vehicle because he observed a traffic violation. Second, the government argues that the stop was justified by the evidence gathered from the wiretap of Vargas's phone and the surveillance of Maldonado's house.

The government is correct that law enforcement officers may stop a vehicle if they observe the driver of the vehicle committing a traffic violation. This remains true even when the officer's subjective motivation for the stop is to investigate for narcotics. See Whren v. United States, 517 U.S. 806, 819 (1996); United States v. Ramirez, 473 F.3d 1026, 1031 (9th Cir. 2007). Here, Royal testified that he observed defendant driving over the speed limit. Royal averred that he determined the speed of defendant's vehicle by conducting a "bumper pace." Police officers "bumper pace" a vehicle they suspect of speeding by matching speed with the vehicle. The officers then measure the speed of their own automobile to determine whether the suspect vehicle is in fact speeding.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

Defendant challenges Royal's testimony about the bumper pace by pointing to a video of the stop taken from the dashboard camera of Royal's police cruiser.  See Gov't Opp. Ex. D (video of stop).  Defendant argues that the video shows Royal continually accelerating to catch up with defendant's vehicle, and then pulling defendant over; the video does not show Royal conducting a bumper pace.  In response, the government points to testimony from Royal that he conducted the bumper pace before the cruiser's dashboard camera began recording.

The Court need not resolve this factual dispute because even if Royal had not observed a traffic violation, he nonetheless would have been entitled to stop defendant's vehicle to investigate for narcotics.  In order to justify the initial investigatory stop of defendant's vehicle, Royal did not need probable cause.  Instead, Royal needed only a "reasonable suspicion to believe that criminal activity 'may be afoot.'"  United States v. Arvizu, 534 U.S. 266, 273 (2002).  Furthermore, the Court does not evaluate reasonable suspicion from the perspective of Royal alone.  As defendant acknowledges, the Court "look[s] to the collective knowledge of all the officers involved in the criminal investigation."  United States v. Sutton, 794 F.2d 1415, 1426 (9th Cir. 1986).

Here, the collective knowledge of the officers involved in the investigation included information gleaned from the wiretap of phone conversations between Sergio Vargas and Victor Suarez.  The government contends that, based on their training and experience, the officers were able to decipher the conversations between Vargas and Suarez and conclude that they were planning to smuggle methamphetamine from Los Angeles to San Jose with the assistance of defendant.[1]  The government's translations of this allegedly coded language, although not conclusive, are nonetheless relevant to determining whether the officers had probable cause or reasonable suspicion to believe the vehicle was transporting narcotics.  See United States v. Beltran, 11 Fed. App'x 786, 787 (9th Cir. 2001) (finding that when a law enforcement officer "submitted an affidavit in which he provided his interpretations of 'coded' conversations recorded by previous wiretaps, . . . the district court could . . . rely on those interpretations to find probable cause").  Here, the government's interpretations of the wiretap conversations is corroborated by the surveillance of Maldonado's home, which revealed Suarez placing a "weighted black bag" in the rear of the Caravan, and then driving north towards San Jose.

---

[1]      Although defendant was never directly recorded on the wiretap, Suarez relayed to Vargas that defendant was "asking why we are doing this all under so much pressure.  She's like, 'Tell him that if he wants, you and I leave tomorrow instead in my truck . . . .'" Davila Decl. ¶ 6.  Cf. Hart v. Parks, 450 F.3d 1059, 1066 (9th Cir. 2006) ("Police may rely on hearsay and other evidence that would not be admissible in a court to determine probable cause.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**


Accordingly, while defendant correctly notes that no officer actually saw narcotics being placed in her vehicle, this evidence, taken as a whole, is highly suggestive of criminal activity. It may even rise to the level of giving the officers probable cause to believe that the vehicle contained narcotics.  Even if it does not, the coded conversations and subsequent surveillance certainly gave the officers "reasonable suspicion to believe that criminal activity 'may be afoot.'" Arvizu, 534 U.S. at 273.  In other words, the officers' conclusion that Vargas, Suarez, and defendant were coordinating the transportation of narcotics was not the product of an "inchoate and unparticularized suspicion or 'hunch,'" but was instead a "reasonable inference" based on the facts available to them.  Terry v. Ohio, 392 U.S. 1, 27 (1968).  Under the collective knowledge doctrine, Royal was thus entitled to stop defendant's vehicle for further investigation.

**B.      Deployment of Narcotics Dog**

Because the initial stop of the vehicle was valid, the Court next turns to Royal's use of the narcotics dog during the stop.  Defendant objects to the use of the dog after she was stopped and cited.  The Court finds that Royal's use of the dog did not violate the Fourth Amendment. First, it is clearly established that a dog sniff is not a search, and thus does not itself raise Fourth Amendment issues.  See United States v. Place, 462 U.S. 696, 707 (1983).  Second, although Royal continued to detain defendant and her vehicle while he conducted the dog sniff, this detention was supported by reasonable suspicion.

Defendant is correct that this additional detention while Royal conducted the dog sniff cannot be justified on the grounds that Royal observed the Caravan exceeding the speed limit. Royal had finished issuing defendant a speeding ticket before beginning the dog sniff.  Royal Decl. ¶ 6.  Accordingly, although defendant's alleged speeding violation could potentially justify the initial stop of the vehicle, it cannot justify the further detention during the dog sniff. "A seizure that is justified solely by the interest in issuing a [traffic] ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005).

As discussed above, however, the stop here was not "justified solely by the interest in issuing a traffic ticket."  The wiretap and surveillance had given Royal reason to believe that defendant was smuggling narcotics.  Based upon this reasonable suspicion, Royal could detain defendant and her vehicle while he "diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly." United States v. Sharpe, 470 U.S. 675, 686 (1985).  Here, Royal appears to have conducted a "diligent" investigation: less than ten minutes elapsed between when Royal finished writing the speeding citation and when he completed the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

dog sniff of defendant's vehicle.  See Gov't Opp. Ex. D (video of stop).  Accordingly, the seizure of defendant during the dog sniff was adequately justified by the reasonable suspicion gleaned from the wiretap and surveillance.

**C.      Search of Defendant's Vehicle.**

Finally, the court turns to Royal's search of the interior of defendant's vehicle.  As part of this search, Royal dismantled the interior plastic panels in the rear of defendant's vehicle and discovered the narcotics at issue in this motion.  Royal Decl. ¶ 12.  Because this intrusion included disassembling the interior of defendant's vehicle, it was undeniably a full-fledged search, and thus must be supported by probable cause.  Under the automobile exception, however, no warrant was required: "Police officers who have stopped an automobile legitimately and who have probable cause to believe that contraband is concealed somewhere within it may conduct a warrantless search of the vehicle."  United States v. Garcia, 205 F.3d 1182, 1187 (9th Cir. 2000).

Here, the government contends that Royal had probable cause to believe that narcotics were present based on (1) his dog's alert during the sniff and (2) the prior wiretap and surveillance evidence.  The Court agrees.  As discussed above, Royal inspected the exterior of defendant's vehicle with his certified narcotics dog.  See Opp. Ex. C (evaluation report for narcotics dog)  During this inspection, the dog "alerted" towards the rear right of defendant's vehicle.  Royal Decl. ¶¶ 10–11.  This dog alert alone would provide Royal with probable cause to believe that narcotics were present.  See United States v. Cedano-Arellano, 332 F.3d 568, 573 (9th. Cir. 2003) ("[T]he 'alert' by the certified, reliable narcotics detector dog was sufficient, even by itself, to support a finding of probable cause.").

Defendant argues that, although the dog alert could provide probable cause for a magistrate to issue a warrant to search defendant's vehicle, it was insufficient to support a warrantless search pursuant to the automobile exception.  This contention finds no support in Ninth Circuit authority, which does not distinguish between the probable cause required for searches pursuant to a warrant and the probable cause required for searches pursuant to the automobile exception.  Compare United States v. Battershell, 457 F.3d 1048, 1050 (9th Cir. 2006) (citing Illinois v. Gates, 462 U.S. 213, 238 (1983), for definition of probable cause required to justify issuance of warrant), with United States v. Rodgers, 656 F.3d 1023, 1028 (9th Cir. 2011) (citing Gates for definition of probable cause required to justify search pursuant to automobile exception).  Moreover, courts have repeatedly upheld warrantless searches of automobiles based on probable cause provided by a narcotics dog alert.  See, e.g., United States

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

v. Ibarra, 345 F.3d 711, 716 (9th Cir. 2003); United States v. Sandoval, 2012 WL 1901302 (E.D. Cal. May 24, 2012).

Furthermore, the government need not rely on the narcotics dog alone, because the dog alert is buttressed by other evidence.  The dog alerted towards the rear of the vehicle, where just hours earlier other officers had observed Suarez placing a weighted black bag.  Taken together with the wiretap recordings suggesting an organized effort between defendant, Vargas, and Suarez to transport something to San Jose, this evidence created a "fair probability that contraband or evidence of a crime" would be found in defendant's vehicle.  Gates, 462 U.S. at 214 (1983).  The Court therefore concludes that Royal's search and subsequent discovery of the narcotics was valid.

**IV.     CONCLUSION**

In accordance with the foregoing, defendant's motion to suppress the narcotics discovered in her vehicle is hereby DENIED.

IT IS SO ORDERED.

|  |  |  | 1 | : | 07 |
|---|---|---|---|---|---|

Initials of Deputy Clerk     MS

cc:

## LIST OF EXHIBITS AND WITNESSES

| Case Number | CV 12-1076-CAS | Title | U.S.A. v. ROSA MARIA MAYORQUIN |
|---|---|---|---|
| **Judge** | Christina A. Snyder | | |
| **Dates of Trial or Hearing** | 09/20/13 | | |
| **Court Reporters or Tape No.** | Laura Elias | | |
| **Deputy Clerks** | Monica Salcido | | |

| Attorney(s) for Plaintiff(s) / Petitioner(s) | Attorney(s) for Defendant(s) / Respondent(s) |
|---|---|
| Rosalind Wang | Gregory Nicolaysen |
| | |
| | |
| | |
| | |

| Plaintiff(s) or Petitioner(s) | | | Defendant(s) or Respondent(s) | | | EXHIBIT DESCRIPTION / WITNESS | Called By |
|---|---|---|---|---|---|---|---|
| Ex. No. | Id. | Ev. | Ex. No. | Id. | Ev | | |
| | | | | | | Randy Royal - C/S/T - Resumed from 9/16/2013 | Defendant |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |